[No. 1140-3. Division Three. March 20, 1975.]

LOUIS KING et al., *Plaintiffs*, v. NORTHWEST WHEEL, INC., *Appellant*, R. C. KERCHEVAL, JR., *Respondent*.

*Robert H. Whaley* (of *Winston, Cashatt, Repsold, Mc-Nichols, Connelly & Driscoll*), for appellant.

*Paul W. Robben* (of *Barnett, Robben, Blauert, Pease, Doces & Lewicki, Inc., P.S.*), for respondent.

GREEN, J.—Louis King brought this action against Northwest Wheel, Inc., to recover damages for personal injuries.

Northwest filed a third-party action for indemnity against R. C. Kercheval, Jr. Northwest compromised and settled the action brought by King. Following a trial to the court in the third-party indemnity action, judgment was entered in favor of Kercheval. Northwest appeals.

The facts are undisputed. Northwest Wheel, as shipper, entered into a transportation contract with Kercheval as carrier. King, who owned and operated a 1970 Kenworth tractor and trailer, entered into a relationship with Kercheval whereby he would transport the commodities covered by the Northwest-Kercheval contract. The details of the King-Kercheval relationship are not involved in the indemnity action.

On July 18, 1970, King arrived in Spokane with commodities for the shipper, Northwest Wheel. King backed the truck up to Northwest's loading dock and Northwest's employee began unloading the commodities. A pallet with a bin on it was placed in the truck and King assisted Northwest's employee in filling the bin with loose wheels. Northwest's employee then got on a forklift to remove the pallet and instead of backing up drove ahead, injuring King who lost his left foot.

Northwest seeks to recover from Kercheval the amount paid to King for his injuries under the following provision in the Northwest-Kercheval contract:

It is further agreed that carrier [Kercheval] will indemnify shipper [Northwest] harmless from all costs, expenses, claims and damages *arising from such transportation*, including indemnity and property damage, cargo loss, public liability for injury to or death of persons or property.

(Italics ours.) Basically, Northwest contends that the word "transportation" as used in this indemnity provision includes unloading of the commodities and the trial court erred in holding to the contrary. We disagree.

The general rules applicable to the construction of contracts are summarized in *Grant County Constructors*

*v. E.V. Lane Corp.*, 77 Wn.2d 110, 120-21, 459 P.2d 947 (1969):

> [T]he courts are in nearly universal agreement in construing written contracts that the primary purpose of a judicial interpretation is to ascertain the parties' intentions, give effect to them and make the parties' intentions controlling. . . . The intentions of the parties should be ascertained from the entire writings, and, if at all possible, all parts of the writings shall be construed so as to harmonize with one another. . . .
>
> The most reliable clue to the parties' intentions in a deliberately prepared and negotiated contract is the language of the contract. . . . When the intention of the parties is clear from the written instruments, the courts have *nothing to construe* and must be governed by the language. . . . Words will be given the meaning which best gives effect to the parties' apparent intentions. . . .
>
> Thus, it follows that the courts cannot and ought not make contracts for the parties and, assuredly, cannot make a contract for them which they did not make for themselves. . . . Courts should take care under the guise of interpretation not to rewrite the contract for the parties, or create a new one.

With respect to indemnity contracts, the court in *Continental Cas. Co. v. Municipality of Metropolitan Seattle*, 66 Wn.2d 831, 835, 405 P.2d 581 (1965), said:

> In *Union Pac. R.R. Co.*, [64 Wn.2d 486, 392 P.2d 450 (1964)] *supra*, we approved the rule that:
>
> ". . . Contracts of indemnity, therefore, must receive a reasonable construction so as to carry out, rather than defeat, the purpose for which they were executed. To this end they should neither, on the one hand, be so narrowly or technically interpreted as to frustrate their obvious design, nor, on the other hand, so loosely or inartificially as to relieve the obligor from a liability within the scope or spirit of their terms."
>
> . . .
>
> [T]he duties and obligations of the parties must be determined and measured by the language of the agreement.

Thus, the meaning of the word "transportation" must be determined from the language of the entire agreement.

Turning to the agreement, we find the following provision:

> Shipper hereby delivers to Carrier for transportation shipments of the commodities herein designated that are to be moved by motor vehicle *between the points* named herein, on which shipments he controls the routing, and *to pay* compensation to Carrier *for such transportation* as follows:
>
> As set forth in Exhibit A attached hereto and made a part hereof.

(Italics ours.) Exhibit A, the tariff schedule, provides:

> Rates named herein include not more than three pick-ups within the limits of each point of origin and only one delivery at point of destination. Such pick-up and delivery service will be made only from or to points directly accessible to carrier's vehicle. *Rates to NOT include loading or unloading of shipments to or from the vehicle.*

(Italics ours.) It is evident that the rates agreed upon between Kercheval and Northwest did not cover unloading of the commodities from King's truck. It follows that Kercheval had no duty under its contract to unload or assist Northwest in unloading the truck. To hold that the word "transportation" in the indemnity provision comprehends unloading would result in the imposition of an obligation upon Kercheval beyond the service paid for by Northwest under the tariff rate. Such a result would not be within the intention of the parties, derived from a reading of the contract as a whole and hardly within the principles of contract construction referred to above. Thus, we hold the trial court was correct when it entered conclusions of law that:

> The transportation in the instant case terminated upon the driver's facing the trailer in a position where the unloading operations could be taken over by the shipper.

and:

> The use of the word "transportation" in the Indemnity Agreement is synonymous with the obligations imposed upon the carrier by the tariff agreement. Since the carrier was not required to unload, transportation in this case ceased when the truck was ready to be unloaded.

Had the parties desired to express a different intention, the contract should have so provided.

■ We do not agree with Northwest that because Kercheval held an interstate commerce carrier permit, the term "transportation," as defined in 49 U.S.C. § 1(3) (1959),[1] should be the definition given to the indemnity provision. In *Railroad Retirement Bd. v. Duquesne Warehouse Co.*, 326 U.S. 446, 90 L. Ed. 192, 66 S. Ct. 238, 241 (1946), the court observed:

> The duty of unloading carload freight ordinarily rests with the shipper or consignee. . . . But it is a transportation service within the meaning of the Interstate Commerce Act. . . . Its cost may be included in the line-haul tariffs or separately fixed or allowed as an additional charge.

While the definition of "transportation" under the Interstate Commerce Act is broad, it is clear that the parties to a transportation contract may provide for a more restricted definition. This the parties did in the transportation contract herein. Kercheval had no duty to unload and was not paid by Northwest to unload the truck.

■ Neither do we agree with the contention that as the commodities being unloaded were not yet out of the hands of the carrier, Kercheval, the goods had not been delivered and as such were still in the transportation process. The authorities cited in support of this contention are distinguishable in law or in fact from the present case.[2]

---

[1] 49 U.S.C. § 1(3) provides: "The term 'transportation' as used in this chapter shall include . . . all instrumentalities and facilities of shipment or carriage, . . . and all services in connection with the receipt, delivery, elevation, and transfer in transit, . . . and handling of property transported."

[2] *Roy & Roy v. Griffin*, 26 Wash. 106, 66 P. 120 (1901) (Shipping instructions directed defendant to load and ship. The court found delivery to carrier was delivery to the shipper-consignee, when defendant loaded the cars.); *Normile v. Northern Pac. Ry.*, 36 Wash. 21, 77 P. 1087 (1904) (Delivery not completed until consignee was afforded a reasonable chance to remove the goods.); *Dohrmann Hotel Supply Co. v. Owl Transfer & Storage Co.*, 19 Wn.2d 522, 143 P.2d 441, 149 A.L.R. 1108 (1943) (Delivery completed when the truck was presented at the

Affirmed.

McINTURFF, C.J., and MUNSON, J., concur.

unloading dock.); *Loesch v. Union Cas. & Sur. Co.*, 75 S.W. 621 (Mo. 1903) (Cattle on railroad cars were "in transit" within the terms of an insurance policy designating the insured's occupation as a "stock dealer not working nor tending in transit" until they were unloaded from the cars of the company and placed in pens.); *Keystone Motor Freight Lines v. Brannon-Signaigo Cigar Co.*, 115 F.2d 736 (5th Cir. 1940) (No delivery where anything remains to be done by the carrier.); *Hanaman v. Liberty Trucking Co.*, 243 Wis. 478, 11 N.W.2d 130, 149 A.L.R. 640 (1943) (Carrier specifically contracted in the tariff schedule to participate in unloading.); *Murphy v. United States*, 133 F.2d 622 (6th Cir. 1943) (Cigarettes were transported by the carrier and temporarily stored in its warehouse [from which they were stolen]. Consignee had prepaid for delivery to its place of business. The court found the cigarettes to be in interstate commerce while in the carrier's warehouse.); *Walling v. Consumers Co.*, 149 F.2d 626 (7th Cir. 1945) (Question was whether defendant's employees who were unloading merchandise shipped from out of state were engaged in interstate commerce for purposes of the Fair Labor Standards Act of 1938, § 3(b), 29 U.S.C. § 203(b). The court answered in the affirmative stating that "unloading at destination of an interstate shipment is work in interstate transportation, whether done by the carrier or another."); *Meier & Pohlmann Furniture Co. v. Gibbons*, 233 F.2d 296 (8th Cir. 1956) (Where the tariff provided for pickup and delivery, the court found pickup and delivery service to be within the definition of "transportation."); *also, Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334 (1st Cir. 1970); *Illinois Central R.R. v. Moore*, 228 F.2d 873 (6th Cir. 1956) (The court found sufficient delivery to the carrier where custom and practice was for shipper to place the goods on carrier's premises.); *Rupp v. Hanover Fire Ins. Co.*, 311 S.W.2d 58 (Kan. City App. 1958) (While gasoline was being discharged from the delivery truck into a storage tank, an explosion occurred. The court found that the gasoline was destroyed in the process of being delivered. However, the parties had agreed that "discharge into the storage tank constituted delivery." Thus, there had only been partial delivery at the time of the accident.); *National Trailer Convoy, Inc. v. United States*, 293 F. Supp. 630 (N.D. Okla. 1968) (Court held that carrier-applicant's proposed services of installation and repair of mobile homes constituted "transportation services" within the meaning of the contract carrier provisions of the Interstate Commerce Act.).